The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Well, good afternoon to everyone. We have a couple cases for argument today. Your panel today is Judge Thacker and Judge Quattlebaum and myself. We're sitting virtually, but I assure you this is the real Court of Appeals. So, with that, we will proceed. I ask all of the Council be mindful of the times that you allot it for yourselves. Otherwise, I may have to just prod you a bit as we approach those time periods. And we will proceed in the usual manner. So, let's begin by hearing the first case, which is the Halper case. And we'll hear from Attorney Biss. Judge Wynn, thank you, sir. May it please the Court. My name is Stephen Biss, and I represent Svetlana Lokova in this case. The Supreme Court of the United States, in a unbroken line of cases spanning as long as this country has been around, there ought to be a natural balance between a person's uninterrupted right to an unimpaired reputation and freedom of the press. That's a natural tension that exists in this case. This case demonstrates that something is out of whack. It should never be a case where a political operative and the press should be able to collude to impair the reputation of a private citizen. So, Mr. Biss, let's go directly to the issues here. Yes, sir. Unlike the jury argument or talking to the press, you've got some limited time here. And I think it's very important to get directly to the issues. So, why don't you start with the first issue and proceed in the manner that you would like. Yes, sir. So, we're before the Court on a de novo review of a motion to dismiss under Rule 12b-6. The district court erred for a number of reasons that are set forth in the brief. I do have limited time. I'd like to focus on the court initially. I'd like to focus on the tortious interference with contracts. We allege in this complaint and the briefs documented, page 7, page 42 of the brief, we allege specifically in our amended complaint that Stephon Helfer was the source of the defamation. The defamation that ultimately led to the termination of my client's court view. Excuse me. This is Judge Thacker. I think you need to back up and identify, at least for me, what the defamation is. Sure. Judge, the defamation includes allegations that my client had an affair with General Michael Flynn. That's a defamatory statement. Where in the record does it say that your client, by name, had an affair or any sort of sexual relationship with anybody? Well, Judge, it is specifically stated in the complaint. Mr. Helfer alleged that to a reporter with the Sunday Times in London. Is that the unnamed reporter? Judge, it is a reporter at the Sunday Times. I don't have the amended complaint up in front of me to answer your question specifically. On a motion to dismiss, you don't have the amended complaint in front of you? Judge, I'll pull up the amended complaint right now. I'll find it. You go ahead. So the amended complaint specifically alleges, Your Honor, in two important respects that Mr. Helfer was the source of the extramarital affair comment. We allege specifically that he made those comments to a Sunday Times reporter. And we specifically allege that he repeated those comments to colleagues of Ms. Volkovich at Cambridge University. Those are specifically alleged in the amended complaint. And if the court gives me one moment, I will find a specific reference in the record to those allegations. So in paragraph four of the amended complaint, we allege that Mr. Helfer made the false statement that the plaintiff had an affair with General Flynn on the orders of Russian intelligence. In paragraph 10, that allegation is again repeated. The declaration of falsity is in paragraph 26 of the amended complaint. In paragraph 102, Your Honor, Ms. Volkovich specifically alleges that Helfer told the Wall Street Journal that Volkovich and Flynn had an affair. And I would submit, Your Honor, that the identity of the Wall Street Journal reporter is also identified in the complaint. In paragraph 104, again, the allegation of an affair is there. Paragraph 105. And so there are multiple places in which the in which the allegations of this affair are alleged. There are specific allegations also that Mr. Helper falsely accused my client of being a Russian spy or of being associated with the Kremlin. And the allegation is very clear that my client, a Russian, tried to compromise General Michael Flynn at a February 28 meeting at Cambridge. And these allegations we submit, Your Honor, are extremely defamatory. We submit that the allegations were made intentionally as part of a campaign to destroy the reputation of General Flynn and Ms. Volkovich. And I would also submit that when we talk about Russian collusion in the context of this amended complaint, there can be no suggestion that the allegation of Russian involvement is about my client. No question whatsoever. Ms. Volkovich alleges clearly that Helper was the source. The district court, I submit respectfully, erred in rejecting that. That's a factual allegation. That allegation ought to have been accepted as true. We ought to have been allowed to go forward with the tortious interference claim and prove the allegation. Because as we now know, four years after the fact, four years after the publication of the article that issued, we now know from declassified material that Mr. Helper, in fact, was the source. We were right all along. But the district court ought to have, as a matter of Twombly and Iqbal, as a matter of the initial gatekeeping function, the district court ought to have accepted these allegations as true. The district court ought to have given us every benefit of the doubt. And I don't think there's really any dispute about the standard of review. Rather, in this case, highlights… When you're talking about the articles at issue, you're talking about the New York Times articles and others that indicated some concern with Mr. Flynn and a Russian at dinner. Is that it? Judge, we're talking about a – actually, with regard to Stephon Helper, we're talking about a series of publications that begin with a Financial Times article that's cited in the amended complaint and in the briefing. Then we go to the article that was published by Mr. Andrew, and that article was published in February. Then we go to the Wall Street Journal article, then a series of articles that were all published that then promoted this false narrative. The whole narrative… Give me those dates that you were saying in which these things were published. Yes, sir. There is the – this false narrative, Judge, that there was a Russian… No, no, no. Just give me the dates of the matters you just mentioned. The Financial Times article was in December of 2016. That was before May 23, 2018? Yes, sir. Okay. It was. Okay. That was – and with regard to the tortious interference claim, Judge, it's a five-year statute limitation. So I begin with the December 2016 article. We then go to the February 2017 article by Mr. Andrew that falsely alleged that there was email communication between my client and General Flynn, and General Flynn referenced himself as General Misha. Then we go to the article being marked by the nonmedia defendant in this case, the Guardian, the Sunday Times, and others. Then we go to the Wall Street… were intentionally interfered with. What are the specific relationships? Sure, Your Honor. There is a – there was a second book deal with Norton & Collins that was canceled as a result of the allegations that my client had compromised General Flynn or had done something inappropriate at this dinner. And you allege that Hamper knew about this? Yes, sir. We do. We allege that specifically. It's in paragraph six. And in our brief, it's discussed in pages 50 and 51 of the brief and on pages 16 and 17 of our response brief. And could you please – counsel, counsel, this is Judge Qualabong. If you could – I'm more worried about your complaint than the brief. Yes, sir. So I want to make sure I get the place where you're saying that Mr. Halper knew of that relationship. I think you said paragraph six? Yes, sir. Paragraph six in paragraph 197. We specifically allege – and this is – I'll give Your Honor the site for the amended complaint. Or if Your Honor would like, I'll give you the site for the joint appendix, whichever is easier. No, I have it. Yes, sir. Just the paragraphs are fine. So in the amended complaint, we allege specifically how and why Halper knew. This is paragraphs 58, 76, and 198. And we specifically allege in paragraphs six and 197 what the contracts and business expectancies were, including the book deal. Yes, sir. I'm looking at paragraph 197, and it says that, you know, your client had expectations of book deals and employment. And then 198, it said defendants had knowledge of her contracts and business expectancies. Do you have something with any more factual specificity? I mean, I'm not trying to make a decision here, but some might say that's somewhat conclusory. Do you have something that actually are facts that, you know, if true, would show that he actually knew about them? We do, Your Honor. Your Honor, in the opening brief that we filed, we specifically, this is beginning on page 51 of the brief, but the amended complaint paragraph. No, no, no. It won't work to have it in your brief, what Judge Quattlebaum is mentioning. Where is it in the complaint? Yes, sir. Yes, sir. It's paragraphs 43, 56, 76, and 198. What we allege in these paragraphs is that Mr. Helper was the convener of these intelligence seminars until July 2016. He was aware of his local participation in the seminars. He was aware of her participation in something called the Cambridge Security Initiative. In September of 2015, he was involved in approving her appointment to a fellowship. And as a result of his position at Cambridge and his interactions with Mr. Dearlove and Mr. Andrew, he was aware of her book deals and business expectancy. That's in paragraph 43, 56, 76, and 198 of the amended complaint. And, again, I just want to direct you, Your Honor. Could you repeat those one more time? One more time, please, sir. Sure. It's paragraphs 43, 56, 76, and 198. Read together, Your Honor, all allege that the basis for which we believe Mr. Helper, especially his interactions with Dearlove and Andrew, he was aware of his book deal. We allege that he was aware. And I think with that allegation, with those allegations viewed in a light most favorable for this plaintiff, coupled with the other allegations in the complaint, that he was the source of the false allegations that he was having. Well, you brought up the Hick ball and the Twombly cases and what Judge Qualibon was getting to. I'm sort of there, too. You do state it, but it is a conclusion that you're stating. And what we are looking for are the specific facts that would support the conclusion other than you say it. Well, Judge, I think that we've described what Mr. Helper's role was, what his interaction was with his colleagues, what his knowledge of Ms. Lokova's status at Cambridge was. And we allege very, very specifically here that with all of those facts put together, especially his interaction with Mr. Andrew, who was aware of all these book deals, Mr. Helper was aware of her book deal based on all those facts. And I would submit to Your Honor that when the allegations, when the inferences are resolved in plaintiff's favor and all the allegations are accepted as true, there is enough to show that he had knowledge. He was aware that she had these book deals and that the action that he took was intentionally interfered with those book deals, causing her to lose the book deal. The other thing that I would commend to Your Honors is Mr. Helper was the one who was peculiarly, this issue of awareness is peculiarly within Mr. Helper's knowledge and understanding. This is not something that can be proven with anything other than discovery in the case. But we certainly allege that he was aware. And based on the cases that we cite, cases from the Fourth Circuit, the Eastern District of Virginia, the allegation of awareness on these facts is sufficient to get past the point. So, Mr. Biss, you made several arguments and brought up several issues and you chose to argue just this one. Is that an indication you believe this is your strongest argument before us? No, sir. I filed a very lengthy brief. I understand, but I'm just going on based on what you chose to focus before this court on this one issue. But now your time is up. If you want to dig into your additional time, you can do so or you can save it and bring that back up when you come back. Yes, sir. I think that's what I'm going to do. Thank you, Judge. All right, then we will move to hear from the counsel for Appalachia, starting with Mr. Berlin. Good afternoon. I represent the New York Times and Dow Jones, the publisher of the Wall Street Journal. After I speak, we'll hear from Mr. Hammond, who represents NBC Universal and the Washington Post, and then from Mr. Reed, who represents Mr. Halberd. Let me ask you, before you start, so I understand. Now, this issue on notorious interference with contracts and business expectancies, it doesn't seem to apply to the media defendants, and it seems as though this must be seen to be presented from Halberd. So is that something that affects your clients? Our best understanding of this case, Your Honor, is that it does not. For a couple of reasons. First, that the forceless interference claim was not – we argued about this in the trial court, and Mr. Biss did not respond on that to the media defendants at all, number one. When we got to this court, the arguments in the briefs are only addressing Mr. Halberd, not any of the other defendants, and we took that to be that that argument was waived. Number three – That's the way it appears to me. I don't know what my colleagues think about it, but it looks to me, and that was the way in which Mr. Biss seemed to have argued it, is focused on Mr. Halberd here. And so I assume that what you're about to tell us will address, maybe touch upon the other issues that he didn't touch on now, but you proceed as you wish. Well, let me just – let me add one other ground, which is on the forceless interference, and then I'll move on, which is that as Mr. Biss – you heard Mr. Biss say just a moment ago that Mr. Halberd, his allegation was that the knowledge and awareness of these book contracts was peculiarly within the knowledge of Mr. Halberd. By extension, that is not peculiarly within the knowledge of any of the other defendants, and as a result, there cannot be a claim for forceless interference. But again, you know, if you don't brief it, you can't argue about it. It's a little hard to respond. The same actually is a little bit true on the statute of limitations issues, the grounds that were the basis for Judge Brinkman's dismissal of the New York Times and Dow Jones, and as you'll hear, I think, from Ms. Hammond, some of the publications by Malcolm Nance, who was commentator for MSNBC. Let me just address those that relate to the Times and the Journal, if I could. Mr. Brewer, if you could speak up just a tad. I'm having a little trouble hearing you, and I apologize, but I want to make sure I hear what you say. I apologize. Is that better, Your Honor? Yes, sir. Thank you. Will do. And be specific regarding the issues you're addressing, because apparently all of you are representing different clients, and there's different allegations that may fit your particular clients, so be specific there. Well, what I'll do here, Your Honor, is to just focus on the Times and the Journal. Let me start with the Journal, since that was the first publication. It was published more than two years before this complaint was filed. It drew a letter of objection from counsel for Ms. Lokova two weeks later, and then she essentially sat on her hands for a couple of years. The Times article that it issued was published more than a year before the statute of limitations period, and as a result, both of them are on their face, barred by Virginia's one-year statute of limitations. What about the – counsel, if I could get – the Times has a – the alleged defamatory article in the Times, I grant you, is outside the statute of limitations period, and I think the grounds for being within the statute are twofold. One, the third-party tweets, and I don't want to talk about that right now, and the other is the republication, the – maybe that's not – maybe that's a conclusion, but the use of the hyperlink of that same article in a subsequent article. If you could address that, please. I mean, I can appreciate your position to third-party tweets and how that – you don't have any control over that, but when you elect to run a second article with a hyperlink that, you know, is in effect the entire article right there, why aren't you exposing yourself at least to be within the statute of limitations when you do that? Sure. So, Your Honor, this case actually presents a good example of why that shouldn't be the case, right? So what we have here is we have an article. The first article is principally about an alleged surveillance of the Trump campaign, and there's a passing reference in a couple of paragraphs, at most, to an interaction between Flynn and a Russian woman. She's not actually identified. And then later, there's another article also about alleged spying on the Trump campaign, and we refer back to this article, right? Let's not refer – whoa, whoa, whoa. You're saying referring back, and I'm not saying it's defamatory at all. I don't know that. I'm just talking about statute of limitations, and you're saying referring back. Well, maybe that's what you say, but it's a hyperlink that actually places the article within the article. So, I mean, that seems different to me than a reference back. For what it's worth, Your Honor, you know, a number of courts, including the Sixth Circuit in Clark and the Third Circuit in Inouye, Philadelphia newspapers, have looked at this variation and concluded that a hyperlink by itself, right, a hyperlink by itself is deemed to be a reference, not a republication, and that what transforms that potentially into a republication is if you restate the defamation. So let's say in the second article that's within the statute of limitations – this is not the case, but let's say that the Times had said that, you know, Ms. Lokova had an affair with General Flynn or Ms. Lokova was spying for Russia and see this article, and then they hyperlinked to the earlier article. Now, that would be a restatement, and that would be a republication that would be within it, and the reason why we don't otherwise want to do that is we want to encourage people who write journals and organizations to be able to refer back to things that have been said either by themselves or by others in the past without fear that doing so, which otherwise expands the understanding of the reader, will expose them to liability. Go ahead, Judge Wayne. The hyperlink simply goes back to the original article, but you're saying if the headline had been included with the ephemeral material, it would probably be more problematic for you. Well, yes. What I'm saying is if you restate the defamation and then say here's a hyperlink, right, that is – then you've republished the defamation. But if you say simply here's a hyperlink, and in this case it's a hyperlink that is in an article that has nothing to do with Ms. Lokova, that should not be the intended republication because it will provide a disincentive for writers to include hyperlinks which otherwise help inform readers. Judge Quattlebaum, you had a further inquiry? No, I think – thank you. You've covered it, Judge Wayne. I'm good. Thank you. All right. Mr. Burling, your time is up. May I have just 30 seconds to wrap up? You may have – 30 seconds. You've got 30 seconds. I just wanted to say because there's been some question about some of these other claims, and I don't know what Mr. Biss will say in reply, that we would just simply rely on our briefs on the conspiracy claim, which is the one other remaining claim, and on the alternative grounds for affirmance, which would speak to the merits of both the journal article and the Times article. And otherwise, I would respectfully request that the judgment be affirmed. Thank you. Thank you, Mr. Burling. Ms. Handman, you're next up. Thank you, Your Honor. Good morning – good afternoon. As we were saying, the tweets and the broadcasts that predate May 23, 2018 are barred by the statute of limitations. Now, whom are you representing here? I'm sorry. I'm representing the Washington Post and NBC Universal. Mr. Nance, whose tweet – there is one tweet that really is still at issue that was in July of 2018. He had two tweets in July 2018, but on appeal, there's only one that the plaintiff appears to be pursuing. And Mr. Nance was named as a defendant in the amended complaint, but never served. And the plaintiff does not disagree that he is not a party at this case. He wasn't in the district court, and he's not been in the appeal. Mr. Nance is also not an employee of NBC. The plaintiff doesn't allege it, nor could she. He was a freelance contributor. And his tweet on July 19, 2018, was from his personal account. In his personal account, he has a biography. Starts with U.S. intelligence, but plus 35 years. Has a number of other things, including best-selling author. And at the very end, says NBC, MSNBC. Doesn't say he's an employee, just a list of all his various biographical details. Well, you really can just get to where you need to go by pointing to Virginia law. We are controlled here by Virginia law. And the question then becomes, in order to establish a claim of this sort, it's a respondent superior mode. And the question is whether there's an employee-employee relationship alleged here. And it looks clear to me there's an agency-type relationship more akin to an independent contractor from that perspective. So, I mean, I don't want to make it too clear-cut, but it's either that or not from your perspective. So, we can talk about the facts of it, but that's essentially what the allegations are setting for.  And as to apparent authority, apparent agency, which is all that would be here, Virginia law is pretty clear that there's no vicarious liability for torts such as libel. And the Garnett case, there it was an actual employee. And the court in 2018 said, you know, we don't want employers, they can't prevent what gets said at the proverbial water cooler. And in the age of COVID, social media is the only water cooler at this point. But is there, counsel, is there any, I mean, and maybe the Sanchez case and others block this from a Virginia law standpoint. That very well may be the case. But, you know, I don't think the plaintiffs are suggesting that an employer should be responsible for every tweet that an employee or agent might issue. The question is, to me, at least subject to the Sanchez case, I mean, are there facts that an employer could do to kind of promote, promote its agent as an expert, to pay its agent to talk about a matter? Yeah. Yeah. And they allege some of this. They allege that an employee retweeted certain of Mr. Nance's tweets. Are there things that you could do to take you out of you're just being held responsible where you're engaged in some type of promotion of the social media publication? Well, as you know, in the tweet question here, don't mention NBC, don't promote NBC or any broadcasts, don't link to any broadcasts. Don't link to any social media of NBC or MSNBC. In fact, he promotes his own book and he links to The Guardian. And these are not promotional acts for NBC. Yes, he's an expert, as we said, and and that's no doubt why he's on TV. But he's not doing the business in his personal account here of NBC. And how would NBC patrol it? They have, you know, dozens and dozens of these experts. So it is, as your honor says, they're not saying he's that the employer should, but it would be even more far fetched. And under Sanchez, as your honor is saying, even under a parent agency, there wouldn't be liability for torts, vicarious liability for torts. And you're speaking of Virginia law here, aren't you? I mean, I mean, it is helpful to I think when we think about these in the general conversation of what Respondent Superior or agency type law or even independent contractor, Virginia had some pretty specific law here, some of which we kind of interpreted one way or the other. But the Sanchez case is pretty controlling. I mean, it is a Supreme Court, Virginia case here. But anyway, proceed if you have some. And I'll just quickly mention that even if there was Respondent Superior, the tweet in question is protected speech. It is about Maria Butina, the Russian spy. And way down on the list, someone says Flynn and Lakova. And Nance replies, very likely. That's exactly the kind of speculative supposition, surmise, conjecture that this court in the biospherics case said that's opinion. And it's even more so in the context of Twitter, where people don't expect, you know, lengthy investigative stories. They expect breezy hyperbole. You have that same 30 second I gave you a co-counsel to wrap this up. That's a problem. Let me quickly say, then, about the Washington Post. That article absolutely did not, and this is what Judge Riekma found, in any way say they were disconcerted by anything that the plaintiff, unnamed in the article, anything that the Russian grad student did. It says specifically disconcerted by Flynn's attention to the Russian grad student. Thank you, Ms. Hinman. Thank you. Your time is up. Mr. Reed, you are the anchor man here on this. Thank you, Your Honor. Terence Reed on behalf of the appellee and cross-appellant, Stephan Halper. This is a $25 million defamation case brought by a plaintiff, a former Cambridge student, alleging that- You're going to talk to us directly about what Mr. Biss took up his time to talk about the whole time on tortuous interference with contracts and business expectancies. He was talking about your client. I will get there. He says the allegations in response to questions myself and Judge Qualabon that your client knew about this, knew about this book deal. It's alleged right there with specificity of the complaint. How do you respond? Well, like most other allegations in the complaint, it's totally conclusive. There are no facts indicating whether or how Professor Halper would have any knowledge of book deals by the plaintiff. In fact, she says she never spoke to him in her life. So even on top of that, so the tortuous interference, there is no interference. The only allegation with respect to interference is the defamation. Okay. And as Judge Brinkman found, when the defamation goes, that goes, it takes with it both the conspiracy and the tortuous interference claim. Because for tortuous interference in Virginia, you have to have an improper means. But counsel, counsel, if I could stop you there, make sure I understand what you're saying. Are you saying I mean, I think you're right that you have to have an underlying tort. I agree with that. Are you saying that the tortuous interference, aside from the knowledge of your client, fails on the merits or fails on the statute of limitations? It fails on the merits. It fails on the statute of limitations. But hypothetically, if the statute, if it was an unquestionably defamatory statement that was outside of one year, but would you get the benefit of that one year statute limitation for defamation if the claim is tortuous interference and has a longer statute? Short answer is no. And the quickest way to get to that answer is to read the statute of limitations statute for Virginia, which specifically says any injury arising out of defamation and is subject to the one year statute of limitation, any injury. And this would certainly, they would have to prove an injury to recover for tortuous interference with opportunities through defamation. But it's not just the statute of limitations. It's that there's no allegation with respect to knowledge. There's no allegation with respect to interference. It would be just the statute of limitations if it applies. That would end this. And you are saying the five year statute does not apply. It's the one year because the underlying to it is defamation? Defamation, that's right. And it's right there in the statute. You don't have to go farther than that. But if I could. Go ahead. If I could continue. This is a suit claiming that Professor Halper was a, quote, rat fucker, end quote, who masterminded a global conspiracy involving among the FBI, the CIA, the Defense Department. Are you getting to your sanctions argument? Because you only have 20 seconds. Is that your sanctions argument that you're getting to? It will hopefully do double duty. But, yes. Okay. Well, I have a question about the sanctions. Go ahead. I was assuming he would get to that. He's reserved three minutes. And I'm thinking that must be what the three minutes is for. But it's up to you. You can use it. Yes. And the three minutes has started now if you want to go ahead and do that. I'm happy to do that. The only point I would make about this alleged, you know, far flung conspiracy is that Judge Frankema ruled that it is conclusory within the meaning of formally, which was a conspiracy case in itself. And that's precisely what this is. It's also arguably defamatory. Yes. As to my clients. Specifically named. Yes. But, again, that is an issue for the court with respect to dealing with litigation privileges, which are important and critical. I'm not trying to diminish them. But it also suggests that they have to be policed. Conduct has to be policed. And that's the reason for seeking sanction. Let's do it this way. I want to make sure we give you full benefit of your time. You do have these three minutes. And so we've discussed the initial appeal. And then there's a sanction. So why don't you go ahead and take, unless you feel like you've now exhausted the sanction, which is fine. But you have three minutes left. And we can use it for rebuttal if you want to, just in general. So would you just prefer to save that and allow a response to come now? I would like to save my three minutes. Okay. And I would simply say that for the statute of limitations arguments, you have to remember, Professor Halper is an alleged, through conclusory allegations, an alleged source. So whatever he said, even allegedly, all preceded a media article. And if they're untimely, then whatever it is they're attributing to him is untimely. Okay, Mr. Reed. We're coming back to you with three minutes. You know, I don't want to break this up too much, but you guys are the ones who had three lawyers here, and you split it up because you have different clients. And so it makes it somewhat short shrift on it. But as was stated by Mr. Berlin, we have rigid briefs. And so keep that in mind, you know, and we'll continue to do so. So, Mr. Bliss, you have about five minutes or so for rebuttal. Would you like to proceed? Judge Quattlebaum, I'd like to address a couple of points that you made on this issue of republication. And I won't address all the issues that are brief, but there is republication that occurred by the repetition by the third parties. And I would submit to Your Honor that in this instance, we were controlled. Weaver says that if the defamation is slander per se, it is a republication. It is a natural and probable consequence of the original publication. The other point I want to raise is that on this issue of republication, it is a jury issue. It should not be decided on a 12 v. 6 motion. The Sumida-Oramo case from New York that we cite all stand for the proposition that it is a jury issue. On the hyperlink question, our position very clearly is that these hyperlinks are a per se republication. When they include the hyperlink within the article, they intend to republish it. They republish it in a new edition of the newspaper, and they republish it to a new audience, which is Twitter or Facebook. That's the whole purpose of republication is to address the situation where a party directs the defamation to a new audience. And that's the whole purpose of republication is to address that. The cases that we cite in our brief establish the proposition that this is a jury issue that ought to be decided. It's an issue that ought to be decided by the jury. The Sumida case, for instance, is distinguishable from what happened in this case. In Sumida, there was a letter stuck in a file that was unintentional, and it was transmitted solely within the same organization. And in this case, we have hyperlinks that are intentionally inserted into an article to continually republish the same false narrative over and over and over. May 18, August 18, April 9, and it goes on and on and on for each of the media defendants. They publish and republish over and over and over. So I think under either the repetition by third parties or by the hyperlink. Mr. Biss, under your theory of republication, what is the limiting principle? When will the statute of limitations ever end? And doesn't your theory run afoul of the single publication rules aimed to avoid an overwhelming multiplicity of lawsuits? Particularly in the age of the Internet and multiple tweets by even single individuals in a single day. Judge, I actually think that our republication rule appropriately addresses it because Judge Quattlebaum used the word control. So these media defendants are in control of the flow of information. They're the ones who make the initial decision to republish that. They're the ones who are in total control of what's going on. Well, that might cancel. That might apply to the hyperlink. Arguably, there's some other issues there. But what you seem to be arguing about the third party tweets would expose a defendant. It seems like, you know, to as long as they are on the Internet, they are essentially subject to the actions that they have no control over. So third parties can get their stuff and tweet it. Seems to me there's a big difference in that type of a situation and the defendant itself republishing it. Judge, it's a question of accountability. It's a question of who's responsible for putting this into the stream of commerce. And these media defendants and Mr. Helper put this stuff into the stream of commerce, not Miss Lokaba. So they're the ones who should be responsible. The question is accountability. So if somebody has a Twitter account and they consistently put out false, misleading, defamatory information, and then at the bottom say retweet and their millions of followers retweet it, is that just countless actionable defamation cases in your view? And it seems like that would be a problem for a lot of people. It is. And what it's going to require is it's going to require the media to self-regulate. So it is. I'm not talking about the media. Just anybody. It does, Judge. They should be. They should be responsible. All right. So anybody who puts out a defamatory, derogative tweet, false tweet, misinformation, and says retweet it to their millions perhaps of followers, they're responsible for that. Judge, I see that my five minutes is up. May I respond to your question? You may indeed. Thank you, Your Honor. Judge, yes. The answer is they are responsible. Well, that's good to know. They should be. They should be the ones self-regulating. They should be the ones avoiding these kinds of hurtful, false, defamatory narratives. They're responsible for what they do and what they did. They should be responsible. It would be the same thing if I was to retweet something or you were to retweet something or anybody was to retweet. We have to be accountable for our actions. But you didn't sue. Counsel, under that theory, you may very well have been able to sue the individual retweeters. I mean, whether or not it's defamatory is, of course, a question. But from a statute of limitations period, maybe you could sue those direct retweeters, the third parties themselves, but you didn't do that. I think that Judge Thacker's question gets to not whether you theoretically could sue a bunch of people you didn't sue and avoid the statute, but whether you can avoid the statute that applies to the original publisher based on conduct of third parties. I think Weaver, the Supreme Court of Virginia, made it crystal clear in Weaver that the actions of third parties are attributable back to the original defamer. The Supreme Court used the word third parties and it said that if it's defamatory per se, then it is per se a republication that's attributable to the original defamer. Judge, I know my time is up. Thank you. Judges, do you have any further questions? Not of Mr. Biss. Not of Mr. Biss. Thank you. Well, thank you, Mr. Biss. Thank you, Your Honor. Mr. Reed, you have about three minutes or so. Thank you, Your Honor. First, if I could touch briefly upon the last point. The Weaver opinion, even though it's from 1957, actually anticipated this very issue because it said and held that the third party republication is not a basis for liability. The third party publishes independently of the original publication and without authority, unauthorized republication. And there's no allegation here that Mr. Halper controlled even the media companies, much less downstream internet chatter from the media companies responding to media articles. There's absolutely no— Counsel, let me stop you there. I'm a little surprised that you're going there. I mean, maybe you can correct me, but you're right. I think Weaver does say that if it's both the independent and unauthorized third party transmission, it would not—it would relate back to the original publisher. But where is it that any of the media publishers expressed any lack of authority to third parties retweeting? I mean, I don't think there's any evidence or there's nothing about that, is there? I mean, they don't—I'm not trying to say this is enough, but it seems to me you've got a pretty hard argument to say third parties are retweeting without authorization when you don't do anything to try to stop it. Well, Your Honor, I don't represent the media companies, so I don't—I'm not speaking on their behalf. But I will say that for an individual, the idea that you could— someone could write a tweet in response to an article and that would trigger internet chatter going on for decades and keeping the statute alive, that is the end of the statute of limitations. If I could briefly turn to the issue of sanctions. We asked for sanctions here for three reasons. First, the use of offensive ad hominem repeatedly. So are you asking for us to sanction for what Mr. Biss—for what was done in the district court or for what has been filed here? Well, Your Honor, it's mostly in the district court. What we're asking is that the court send— But the district court's order is without prejudice. That is correct. And the district court specifically said if this continues in post-litigation, then perhaps the district court would revisit it. So how can we intervene now? You can remand this back for the—for a full record by the district court, taking into consideration post-judgment activity, including in this court. That's what we would ask for. And we've asked for the same relief with respect to the statutory immunity question. The Judge Brinkman didn't address that. But if this court affirms the dismissal, that was—that is a predicate under the Virginia Immunity Statute for award of fees. And we would ask that the court, if it does dismiss—affirm the dismissal on appeal, remand that issue back to Judge Brinkman. Judge Brinkman just—there was a lot on her plate, and she said that she didn't have— she wasn't going to address that entire issue because of the—her dispositions on the other issue. Thank you, Mr. Reed. Thank you, all of the counsel. Judges, do you have any further questions you'd like to ask at this time? All right. If that's the case, then I appreciate argument from all of the counsel here. Thank you for being with us in this unusual format. You know we have the unique distinction of being a court that comes down and shake your hands at the end of arguments. So if you would accept this virtual handshake, it was a pleasure to have you here. Thank you, Your Honor.
judges: James A. Wynn Jr., Stephanie D. Thacker, A. Marvin Quattlebaum Jr.